# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

**LEVORES JAMES BOUTTE**  CASE NO. 6:17-CV-01398

**VERSUS**  MAGISTRATE JUDGE WHITEHURST

**U S COMMISSIONER SOCIAL SECURITY ADMINISTRATION**  BY CONSENT OF THE PARTIES

## ORDER

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the Court finds that the Commissioner's decision should be REVERSED and REMANDED.

## Background

The claimant, Levores James Boutte, was born on January 27, 1969. *Tr. 285*. Mr. Boutte has a limited education (11th grade) and consistent past employment (1989 – 2010) as a mechanic. *Tr. 25, 46, 59, 168-170,179*. Mr. Boutte was discharged from his position as a mechanic in April 2010 after having a hypoglycemic episode at work. *Tr. 47-48 178*.

On November 23, 2014, Mr. Boutte applied for a period of disability and disability insurance benefits. On September 6, 2016 Administrative Law Judge ("ALJ"), Tamia N. Gordon, evaluated whether Mr. Boutte was disabled based on

an onset date of April 20, 2013. *Tr. 13-27*. The ALJ issued an unfavorable decision denying Mr. Boutte's application for benefits.[1] *Id.* On September 23, 2017, the Appeals Council denied Mr. Boutte's request for review. *Tr. 1-6*.

On July 20, 2009, Dr. Kimberly Smith diagnosed Mr. Boutte with diabetes mellitus ("DM"), type I (juvenile)[2], systolic murmur, mixed hyperlipidemia, benign essential hypertension, erectile dysfunction due to organic reasons and leg pain. *Tr.71*. On February 2, 2010 and May 24, 2010, Dr. Smith indicated that Mr. Boutte's diabetes required insulin and was complicated by nephropathy (kidney disease or damage). *Id*. Mr. Boutte began using an insulin pump and in February 2011, Dr. Smith noted no significant improvement in his condition. *Tr.69-71*. Dr. Smith indicated that Mr. Boutte had kidney, vision, and heart problems due to uncontrolled diabetes; she opined that his blood sugar levels were uncontrolled and were likely to cause more organ damage. *Tr.72*. In a letter dated February 8, 2011, Dr. Smith opined that Mr. Boutte was disabled due to uncontrolled diabetes despite the efforts of multiple physicians. *Id.*

---

[1] Mr. Boutte filed a prior disability claim on May 12, 2010 which resulted in a March 25, 2011 unfavorable decision by ALJ W. Thomas Bundy. *Tr.80-88*. The May 12, 2010 claim file was not exhibited in the instant claim despite submission of a written request by counsel. *Tr.228-229*. The 2011 ALJ decision discusses Mr. Boutte's medical treatment during 2009 – 2011. *Tr.80-88*.

[2] The record is inconsistent as to whether Mr. Boutte's diabetes is type 1 (juvenile) or type 2. The Court finds which type of diabetes Mr. Boutte has is irrelevant, instead what is significance is the fact that he was 18 when diagnosed with the metabolic disease.

On January 3, 2012, Mr. Boutte attended a consultative evaluation ("CE") with Scott C. Chapman, M.D. Dr. Chapman opined that Mr. Boutte's diabetes was not optimally controlled and that he needed to have further changes made to his treatment to try to improve his blood pressure and blood sugar control. Dr. Chapman noted that Mr. Boutte had poor peripheral circulation in the bilateral lower extremities. *Tr.240-247*.

The 2011 initial ALJ decision provided that on March 6, 2013, Mr. Boutte's primary care physician, Dr. Kimberly Smith, issued a medical source statement ("MSS") opining that Mr. Boutte was permanently disabled due to uncontrolled diabetes and resulting complications. *Tr.86*. Mr. Boutte notes that Dr. Smith's 2013 MSS is not exhibited in the instant claim file while Dr. Chapman's 2012 CE is exhibited. *R. 10.*

On March 18, 2014, Dr. Smith referred Mr. Boutte to the Lafayette Arthritis and Endocrine Clinic where he was seen by rheumatologist Jennifer Malin, M.D., who noted a history of Lupus verified by positive double-stranded DNA testing. *Tr.257-260*.

In 2014, following an abnormal echocardiogram which showed mild posterior left ventricular hypertrophy ("LVH") and evidence of diastolic dysfunction, Mr. Boutte began treatment at the Cardiovascular Institute of the South ("CIS") for coronary artery disease ("CAD"), Valvular Heart Disease

3

("VHD"), hypertension ("HTN"), and high cholesterol (dyslipidemia). *Tr.268-288*. His treatment at CIS continued throughout 2015 and 2016. *350-405*. In 2016, Mr. Boutte was examined following an emergency room and hospital stay for abnormally elevated creatinine kinase ("CK") and complaints of chest pain and bilateral edema.,

Records from the Acadiana Diabetes Care & Prevention Center for the period of March 2014 through December 2014 reflect that Mr. Boutte had fluctuating hemoglobin AlC ranges and glucose levels.[3] On March 11, 2014, Mr. Boutte's Hemoglobin A1C was 8.2% (with normal being 4.0 – 6.0%).[6] *Tr.304*. On July 16, 2014, Mr. Boutte's Hemoglobin A1C (three month average of a person's blood glucose level) was elevated to 10.3%. *Tr.302*. On October 10, 2014, Mr. Boutte's Hemoglobin A1C was slightly improved at 9.6%, *Tr.299*, and on December 17, 2014, it was 9.4%. *Tr. 298*. Mr. Boutte also had elevated levels of urine albumin (267.6 mg/L with normal being 5 – 92.1 mg/L) and an elevated albumin/creatinine ratio (98.7 mg/g with normal being 1-55 mg/g) on December 17, 2014. *Tr. 298*. On May 21, 2015, Mr. Boutte's Hemoglobin A1C was 11.7%. *Tr. 346*. In particular, on March 11, 2014, endocrinologist Ghyass Rizk, M.D., treated Mr. Boutte and noted he reported decreased energy and was positive for

---

[3] The ALJ explained that "Hemoglobin AlC testing reflects average blood sugar levels over the previous 2-3 months and the higher the AlC level, the poorer the blood sugar control and risk of DM related complications." *R. 7-1, p. 19.*

4

retinopathy and nephropathy. *Tr.296*. Dr. Rizk also noted decreased sensation to vibration. *Id*. On July 16, 2014, Dr. Rizk noted positive findings for retinopathy and nephropathy, decreased sensation to vibration, and added severe sexual dysfunction. *Tr.295*. On December 17, 2014, Dr. Rizk again noted positive findings for retinopathy and nephropathy as well as decreased sensation to vibration. *Tr.294*.

On January 12, 2015, Mr. Boutte was transported to the emergency department via EMS after being involved in a single vehicle accident. When EMS arrived, the claimant was confused. It was determined that he had a hypoglycemic (low blood sugar) episode and his glucose level was 41. EMS gave him dextrose and his mental status improved. At the emergency department, he said that he hadn't eaten much earlier that day and was on his way to get something to eat when he apparently drove through a fence and into a field. He reported that he did not remember the accident. His blood pressure was 149/100. He was found to be uninjured from the motor vehicle accident. *Tr. 329-332*.

Mr. Boutte again presented to the emergency department on January 24, 2015 with complaints of right leg muscle spasm and severe pain from his right thigh to the right side of his chest, which he stated came on suddenly when he was at rest. Blood work showed high glucose, BUN and creatinine levels. The clinical impression was dehydration and muscle cramps. *Tr. 311-313*.

5

On February 20, 2015, Mr. Boutte's mother, Patsy Boutte, completed a Function Report – Adult – Third Party in which she reported that Mr. Boutte has frequent blood sugar level fluctuations due to uncontrolled diabetes that caused disorientation, occasional combativeness, and curling of his fingers and legs. *Tr.188*. She further reported that Mr. Boutte had difficulty with understanding, memory, and concentration due to his blood sugar fluctuations. *Tr.188-195*.

On April 22, 2015, Mr. Boutte again experienced an episode of hypoglycemia while driving. He stated that he did not eat breakfast that day. After being treated with IV dextrose, his glucose level became elevated. His creatinine level was also elevated. *Tr. 265-270*.

From May 12, 2015 through June 10, 2015, Mr. Boutte kept a personal log of his morning and evening blood sugar readings. During the thirty days his readings indicated significantly high levels of blood sugar levels. As only ten out of sixty entries indicated normal blood sugar levels, 80% of the entries indicated uncontrolled blood glucose. Also, Mr. Boutte consistently had elevated creatinine levels, indicating decreased kidney function. *Tr. 276, 317, 545-555*.

Roderick Clark, M.D., FACP, of Acadiana Renal Physicians, initially examined the claimant on May 6, 2014. Dr. Clark noted edema in the claimant's lower extremities and leg cramps the claimant's glucose level was 583 and his creatinine was also elevated. His impression included DM, type I, and Stage III

6

Chronic Kidney Disease ("CKD") with decreased GFR (glomerular filtration rate). *Tr.499*. On subsequent exams in 2014-2015, Dr. Clark's notes consistently included edema/swelling of the claimant's lower extremities/feet and elevated glucose levels. Specifically, in Dr. Clark's subsequent exams Mr. Boutte's glucose levels were high: (1) 10/14/2014—glucose level of 311, *Tr.496-497*; (2) 1/27/2015—glucose level of 239, *Tr.494-495*; (3) 5/5/2015— glucose level of 138, *Tr.492-493*; and (4) 9/15/2015—glucose level of 270, *Tr.490-491*. His impression remained DM, type I and Stage III Chronic Kidney Disease ("CKD"). *Tr.482-509*. On a follow up examination of Mr. Boutte on December 15, 2015, the claimant complained of his feet swelling. *R. 488.* His glucose level was 43 and his creatinine remained elevated. Dr. Clark prescribed Lasix to help address the edema. *Tr.489*.

Dr. Smith referred Mr. Boutte to the emergency department on December 23, 2015 due to his complaints of chest pain and abnormal lab results, specifically a significantly elevated CK level. He also reported having a headache, abdominal pain, nausea and one episode of vomiting. On examination, Mr. Boutte exhibited pitting pedal edema (swelling in the feet and lower legs). On December 25, 2015 his glucose and creatinine levels were elevated and his EKG results were abnormal. He was admitted on December 23, 2015 and discharged on December 25, 2015 with instructions to follow up with his primary care physician. *Tr. 370-371, 473-481*.

7

In a January 7, 2016 follow up examination at CIS, Mr. Boutte complained of occasional chest pains that "come and go" at no specific times, as well as bilateral lower extremity edema. *Tr. 360-363.*

In March 2016, Mr. Boutte was transported to the CIS emergency department for an episode of hypoglycemia. He was treated and released. *Tr. 468-469.*

At a follow up examination at CIS on May 19, 2016, Mr. Boutte's glucose level was 363, and on May 24, 2016 his glucose level was 314. *Tr. 367-368.*

On May 26, 2016 Mr. Boutte was examined at Azar Eye Clinic. During the exam he stated that he could not see the small letters on the eye chart even with his glasses. Part of the examination was delayed due to Mr. Boutte's high blood glucose levels. *Tr. 424-436.* Upon returning the following month, on June 20, 2016, he stated that he was having difficulty getting his blood sugar under control and that it had been 210 that morning. He reported blurred vision and trouble focusing. *Tr. 410-422.*

Dr. Smith, Mr. Boutte's primary care physician, completed a medical source statement (MSS) in July 2016. Dr. Smith indicated that she had seen the claimant for treatment every three months since October 2005 and that she treated him for DM, with complications including vision changes, kidney damage, peripheral vascular disease (PVD), neuropathy, HTN and VHD. She gave the claimant a fair

prognosis. She marked off symptoms of episodic vision blurriness, rapid heartbeat/chest pain, kidney problems, muscle weakness, retinopathy, extremity pain and numbness, vascular disease/leg cramping, dizziness/loss of balance, hypoglycemic attacks and hypoglycemic unawareness. Dr. Smith listed clinical findings of heart murmur, edema, absent pedal pulses and lower extremity numbness. She reported that despite treatment with daily medication, the claimant's DM remained uncontrolled and he continued to have symptoms of organ damage, including syncope, neuropathy and vision changes. *Tr. 512.*

Dr. Smith estimated that the claimant was able to walk 1/2 -1 block before needing to stop and rest or experiencing severe pain. She assessed the claimant as being able to sit for 2 hours at a time and a total of about 4 hours in an 8-hour workday; and stand for 15 minutes at a time and stand/walk for a total of about 2 hours in an 8-hour workday. She further noted that the claimant needed a job that would permit shifting positions at will from sitting, standing or walking and would need periods of walking around during the workday, which he would need to do every 15 minutes for 5 minutes each time. Dr. Smith also indicated that the claimant would need to take 10-15 minute breaks every 1-2 hours during the day, at unscheduled times. She noted that with prolonged sitting, the claimant would need to elevate his legs at waist level at least 50% of the workday, if working a sedentary job. Dr. Smith indicated that while engaging in occasional standing and

9

walking, the claimant needed to use a cane, underneath which she added the comment "if pain is moderate to severe." *Tr. 512-514*.

At the July 21, 2016 video hearing Mr. Boutte stated that his uncontrolled diabetes has grown progressively worse since 2010. *T.47*. He also stated that he had multiple motor vehicle accidents due to blood sugar fluctuations while driving, including at least one during 2015. *Tr.48*. Mr. Boutte reported that when his blood sugar level gets too high he feels dehydrated, weak, fatigued, and confused such that he has difficulty functioning; he also experiences blurry vision. *Tr.48-52*. He reported having daily or near daily episodes of confusion. *Tr.56-57*. He also reported increasing swelling in his legs and feet as well as numbness and tingling, which occasionally causes him to fall. *Tr.49-51*. He stated that he elevates his feet to help alleviate swelling. *Tr.54*. Mr. Boutte testified that his physicians have been unable to control his blood sugar levels; he had an insulin pump but that was removed in lieu of daily injections. *Tr.51*. He reported that he has difficulty walking when his sugar level fluctuates due to muscle cramps caused by dehydration. *Tr.55*.

The vocational expert (VE) testified that an individual who was unable to maintain concentration, persistence, or pace for 2 hours out of an 8-hour workday would be unable to maintain employment. *Tr.61*. Additionally, the need for two unscheduled breaks of 10-15 minutes due to blood sugar fluctuations would

eliminate the ability to perform all full-time work. *Tr.62*. As would the need to elevate one's feet to waist level from 25-50% of the workday. *Id*.

## Assignment of Errors

The claimant argues that the Commissioner's ruling is erroneous because the ALJ failed to account for his non-exertional impairments in assessing his residual functional capacity; therefore, the ALJ's RFC assessment was reached through the improper application of controlling legal standards and is not supported by substantial evidence.

## Standard of Review

This Court's review of the Commissioner's decision is limited to determining whether the decision was supported by substantial evidence and whether the proper legal standards were applied in reaching the decision. 42 U.S.C. § 405(g); *Alfred v. Barnhart*, 181 Fed. App'x 447, 449 (5th Cir.2006). If the Commissioner's findings are supported by substantial evidence and the decision comports with relevant law, the decision must be affirmed. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir.2000). Substantial evidence is more than a mere scintilla and less than a preponderance. *Id*. "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). Finding substantial evidence does not involve a search of the record for isolated bits of evidence that support the

Commissioner's decision; instead, the entire record must be scrutinized as a whole. *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir.1986). The court may not re-weigh the evidence or substitute its judgment for that of the Commissioner. *Boyd*, 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

A claimant seeking Social Security benefits bears the burden of proving that he is disabled. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir.2005. Disability is defined in the Social Security regulations as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C, § 423(d)(1)(A). Substantial gainful activity is defined as work activity that involves doing significant physical or mental activities for pay or profit. 20 C.F.R. § 404.1572.The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled. At step one, an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings. At step two, an individual who does not have a severe impairment will be found not disabled. At step three, an individual who meets or equals an impairment listed in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors. At step four, an individual found capable of performing the work he has

done in the past will be found not disabled. At step five, factors including age, education, past work experience, and residual functional capacity must be considered to determine if the claimant can perform any work other than the work he has done in the past. *See, e.g., Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir.1991), summarizing 20 C.F.R. § 404.1520(b)-(f). *See, also, Masterson v. Barnhart*, 309 F.3d 267, 271–72 (5th Cir.2002).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity, 20 C.F.R. § 404.1520(a)(4), by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the claimant's record. 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if the claimant can still do his past relevant work, and it is used at the fifth step to determine whether the claimant can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps. *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272. At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Id.* This burden may be satisfied by reference to the Medical–Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Id.* If the

Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Id.* If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Anthony v. Sullivan*, 954 F.2d at 293, *citing Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir.1988). *See, also*, 20 C.F.R. § 404.1520(a)(4).

In this case, the Commissioner found, at step one, that Mr. Boutte has not engaged in substantial gainful activity during the period of time under consideration, April 20, 2013 through December 31, 2015.[4] *Tr. 16.* This finding is supported by evidence in the record.

At step two, the ALJ found that Mr. Boutte has the following severe impairments: valvular heart disease; essential hypertension (HTN); diabetes mellitus (DM) type II; diabetic peripheral neuropathy; nephropathy (diabetic); systemic lupus erythematosus (SLE); and obesity. *Tr. 16.*

At step three, the ALJ found that Mr. Boutte does not have an impairment or a combination of impairments that meets or medically equals a listed impairment. At the next step of the process, the ALJ found that Mr. Boutte retains the residual functional capacity to "perform less than the full range of light work as defined in 20 CFR 404.1567(b). He can never climb ladders, ropes or scaffolds;

---

[4] These dates reflect the day after the denial of the claimant's initial application and the last date insured or DLD. *R. 10, p. 6.*

occasionally climb ramps or stairs; and occasionally stoop, crouch, kneel or crawl. He can perform frequent bilateral handling; and, occasional bilateral foot control operation." *Tr. 16.* Mr. Boutte objects to this finding.

At step four, the ALJ found that Mr. Boutte is unable to perform his past work but found, at step five that Mr. Boutte could perform the occupations of cashier, counter rental clerk, and order filler. *Tr.26-27*. Consequently, the ALJ found that Mr. Boutte was not disabled under the Act from April 20, 2013 through December 31, 2015. *T.27*. Mr. Boutte disputes this finding.

**Discussion**

**A. Did the ALJ account for Mr. Boutte's non-exertional impairments in assessing Mr. Boutte's residual functional capacity (RFC)?**

The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the claimant's ability despite any physical and mental limitations. "The regulations require the ALJ to determine residual functional capacity by considering all of the relevant evidence and addressing the claimant's exertional and non-exertional limitations." *Irby v. Barnhart*, 180 Fed.Appx. 491, 493 (5th Cir. 2006) (citing 20 C.F.R. §§ 404.1545, 419.945; SSR 96-8p).

The claimant argues that the ALJ erred in failing to adequately consider all of his vocationally significant medical impairments when determining his RFC. He specifically argues that the ALJ failed to make findings regarding the claimant's non-exertional limitations caused by Stage III Chronic Kidney Disease (CKD) and uncontrolled diabetes (DM). Rather than accounting for the claimant's non-exertional limitation such as frequent swelling of the lower extremities (i.e. the claimant was diagnosed with "pitting pedal edema") causing the need for elevation of the legs, or his disorientation, confusion, fatigue, dehydration and visual disorders, the claimant argues that the ALJ made comprehensive assessments about his condition based on selected evidence. These assessments were made without accounting for the claimant's ability to sustain employment on a full-time basis given his non-exertional limitations.

While the ALJ stated that the claimant's "[t]reatment records from all sources reflected that the claimant's glucose and hemoglobin A1C levels consistently remained high and there were opinions from specialists that the lack of glucose control caused or contribute to other impairments, such as CKD [Chronic Kidney Disease] and NPDR [Non-Proliferative Diabetic Retinopathy]," *Tr. 24*, the ALJ did not account for the claimant's symptoms caused by his consistently elevated blood glucose levels and Stage III CKD in assessing his RFC.

The claimant's medical records are replete with notations stating that the claimant experiences frequent edema or swelling of his lower extremities as a result of his Stage III CKD, and must elevate his legs to help alleviate and/or prevent swelling. *Tr.498-499 (5/6/2014); Tr.496-497 (10/14/2014); Tr.494-495 (1/27/2015); Tr.492-493 (5/5/2015); Tr.490-491 (9/15/2015); Tr.488 (12/15/2015); Tr.360-362 (1//7/2016)*. In addition to the claimant's treating physicians, Dr. Clark and Dr. Smith, and his cardiologist, Salvatore Buttaci, M.D., diagnosing frequent lower extremity swelling due to CKD III, all advised the claimant to elevate his feet to help with swelling. *Id.* Specifically, Dr. Clark prescribed Lasix to alleviate the problem, Dr. Buttaci advised that he should elevate the legs "as much as possible" *R. 362*, and Dr. Smith advised that he should elevate his feet to waist level for 50% of the workday. *Tr. 22*. Further, the claimant testified at the hearing that he had frequent problems with swelling of his lower extremities and elevates his feet as a result. *Tr. 23*. The VE testified that the need to elevate one's feet at waist level 25-50% of the workday would eliminate all full-time work in this case. *Tr.62*.

The claimant further argues that his frequent glucose/blood sugar level fluctuations cause him to experience disorientation, confusion, fatigue, memory problems, dehydration, and vision problems. *Tr.23*. This was verified by the third party function report, *Tr. 23, 188*, as well as by the multiple emergency department records resulting from the claimant's multiple motor vehicle accidents. *Tr.316-317;*

*see also, Tr.24* ("[t]reatment records from all sources reflected that the claimant's glucose and hemoglobin A1C levels consistently remained high. . . ."). The VE testified that the need for two unscheduled breaks per day of 10-15 minutes due to blood sugar fluctuations at work would eliminate all full-time work in this case. *Tr.62*.

The foregoing evidence in the record establishes the claimant's non-exertional limitations caused by Stage III Chronic Kidney Disease (CKD) and uncontrolled diabetes (DM) that were not factored in to the ALJ's residual functional capacity assessment. Thus, the ALJ's adverse conclusion was not based on application of the appropriate legal standard and is not supported by substantial evidence in the record. Accordingly,

**Conclusion and Recommendation**

**IT IS ORDERED** that the decision of the Commissioner be **REVERSED** and **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to properly consider the side effects of the claimant's medical conditions in evaluating his residual functional capacity; and properly evaluate the claimant's residual functional capacity.

**THUS DONE AND SIGNED** this 12th day of October, 2018.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE